Rachel Spears Johnston, Esq.
rachel.spears.johnston@gmail.com
**Attorney ID**: 274372018

RECEIVED

SEP 1 2 2023

U.S. District Court
Middle District of TN

| | |
|---|---|
| RACHEL SPEARS JOHNSTON, *on behalf of herself and all other similarly situated persons*,<br><br>**PLAINTIFF**,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, DEPARTMENT OF EDUCATION, MIGUEL ANGEL CARDONA, SECRETARY OF EDUCATION, VANDERBILT UNIVERSITY, VANDERBILT UNIVERSITY LAW SCHOOL, NELNET STUDENT LOAN SERVICER a/k/a NELNET INC., LENDER DOE 1, and LENDER DOE 2, LENDER DOE 3,<br><br>**DEFENDANTS**. | Civil Action No. 3:23-cv-930(EJR)<br><br>**FIRST AMENDED VERIFIED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 15(a)** |

## INTRODUCTION

1.     This matter comes before the Court upon petition by putative representative Plaintiff Rachel Spears Johnston, Esq. ("Plaintiff") for emergent redress from the scheduled resumption of the iniquitous conspiracy between the federal United States Government and the American university and collegiate system (hereinafter, collectively referenced as the "Academy"), in the direction of the scheme to control and suppress working class achievement of the American Dream, scheduled to begin tomorrow, September 1, 2023.

## JURISDICTION AND VENUE

2.  Jurisdiction is proper in federal court pursuant to the Class Action Fairness Act ("CAFA") 28 U.S.C. § 1332(d)(2). To satisfy CAFA diversity jurisdiction, the putative plaintiff must adequately allege (1) minimal diversity, *i.e.*, that any member of the putative class differs in residence from a putative defendant, which is clearly satisfied here; (2) that the putative class numbers greater than one hundred members; and (3) that the amount in controversy exceeds $5 million. Upon information and belief, the putative class numbers in excess of 43.5 million American holders of student debt. The amount in controversy surpasses the sum of $1.7 trillion, and at least one of the class members is clearly diverse from a defendant.

3.  Venue is appropriately situated in the United States District Court for the Middle District of Tennessee, as Defendant Vanderbilt University is located at 2201 West End Avenue, Nashville, TN 37235, and is therefore a resident of the aforementioned judicial district pursuant to 28 U.S.C. § 1391(b)(1) & (c)(2). Defendant Vanderbilt University Law School is addressed at 131 21st Avenue, Nashville, TN 37203, and is therefore similarly a resident of the district by operation of the same. The Secretary of Education is an officer and employee of the federal government, and therefore venue is proper under 28 U.S.C. § 1391(e)(1). Finally, by servicing loans granted to students under the laws of Tennessee, Nelnet, Inc. has placed itself under the personal jurisdiction of the Tennessee federal court.

## PARTIES

4.  Plaintiff Rachel Spears Johnston, Esq. is an individual citizen of the State of New Jersey, and advances this action as a putative *pro se* representative plaintiff on behalf of all United States citizen holders of student debt. She is incidentally also an attorney. Upon discovering that she was prohibited from sitting for the bar exam without a three-year accredited *juris doctorate* (except if she wished to become barred in California, which has an apprenticeship program), she obtained her law degree from Vanderbilt University Law School. During her tenure, she incurred a six-figure sum of student loan debt, even with the application of a modest scholarship, assistance from family, and her savings from her first job after college.

5.  Defendant Vanderbilt University Law School ("VULS") is addressed at 131 21st Avenue South, Nashville, TN 37203, and is currently ranked number sixteen (16) on the U.S. News & World Report rankings for law schools. Full time tuition alone is estimated by VULS to cost $69,998 per annum. VULS estimates that a prospective attorney will be expected to remit tuition and fees amounting to $72,184 in the 2023-2024 year. VULS further estimates that its students, otherwise unemployed recent college graduates, will be required to produce a total cost of attendance in the amount of $105,528 to attend law school for the 2023-2024 calendar year. Upon information and belief, VULS has stubbornly refused to reduce its admissions costs regardless of extenuating circumstance, even during the entirely remote learning conducted at the height of the COVID-19 pandemic.

6.      Defendant Vanderbilt University is the organizational parent affiliate of Vanderbilt University Law School, and is addressed at 2201 West End Avenue, Nashville, TN 37235. It is therefore a party-in-interest to this suit.

7.      Defendant Miguel Angel Cardona was appointed to serve as the Secretary of Education by the Democratic Administration led by President Joseph R. Biden. Upon information and belief, Secretary Cardona was sworn in as the twelfth Secretary of Education on March 2, 2021.

8.      Defendant Nelnet, Inc., is a relatively unknown quantity beyond its cursory appellation as a "student-loan sevicer." Upon information and belief, Nelnet, Inc. ascended to its position in the wake of the global COVID-19 pandemic. Nelnet, Inc.'s website provides no background as to its specific mission, the services provided beyond student debt servicing, nor exactly how it came to service a significant portion of student loan debt. Investigation into the precise nature or terms of Nelnet, Inc.'s legal relationship with the United States Government provides a dead end. *See, e.g.*, Nelnet, Inc.'s website description of its "Business Services," https://nelnetinc.com/nelnet-business-services/, accessed August 29, 2023 at 10:44 p.m. ("Nelnet Business Services provides payment technology and community management solutions for K-12 schools, higher education institutions, churches, and businesses in the U.S. and internationally. We serve more than 1,300 higher education institutions and 11,500 K-12 schools across the globe."). Upon information and belief, Nelnet, Inc. is one of the four major "loan servicers," contracted by the United States federal government to act as arm's length collections agencies on behalf of the Academy. Upon information and belief, Nelnet, Inc. by operation exists to strong arm inexperienced debtors, bound by law against discharging their debt, into payment of any sum acquired by the working-class debtor in excess to a sum deemed appropriate to a born denizen of the working class.

## **FEDERAL RULE OF CIVIL PROCEDURE 23**
## **CLASS ACTION REQUIREMENTS**

9.      Relief for the army of people financially indentured to the Academy by means of their student debt is properly aggregated in the instant action pursuant to Federal Rule of Civil Procedure 23.

10.     Relief for the army of people financially indentured to the Academy by means of their respective student debt is properly aggregated in the instant action because the putative class numbers in excess of 43.6 million people, which is far too numerous to be practical. *See* Fed. R. Civ. P. 23(a)(1); *see also* Student Loan Debt Statistics, https://educationdata.org/student-loan-debt-statistics, accessed August 29, 2023 at 9:02 p.m.

11.     Relief for the army of people financially indentured to their respective educational institutions by impossibly high student debt figures is properly aggregated in the instant action, because the common questions of fact and law to all claims predominate over any issues particular to individual holders of student debt. *See* Fed. R. Civ. P. 23(a)(2).

12.     Relief for the army of people financially indentured to the federal government and the Academy by impossibly high student debt in relation to their salaries, as well as lifelong earning potential, is properly aggregated in the instant action because the claims and defenses of the

representative party is typical of the claims and defenses of all student debt holders, as further iterated herein. *See* Fed. R. Civ. P. 23(a)(3).

13. Relief for the army of people financially indentured to their educational institutions by means of their student debt is properly aggregated in the instant action because the putative representative Plaintiff is a holder of an immense amount of student debt, far in excess of the average sum—upon information and belief, estimated to be $37,717 per individual holder of federal debt. In point of fact, fewer than 2% of people who hold student loan debt do so by borrowing the sum from an explicitly private lender. *See* Student Loan Debt Statistics, https://educationdata.org/student-loan-debt-statistics, accessed August 29, 2023 at 9:06 p.m. *See* Fed. R. Civ. P. 23(a)(4).

14. Relief for the army of people financially indentured to their educational institutions by their student debt is properly aggregated in the instant action because all of the requirements of Federal Rule of Civil Procedure 23(a) are satisfied, and because the prosecution of separate actions by individual class members would be impossible. Furthermore, the numerosity of the class would virtually guarantee the entry of inconsistent or varying adjudications with respect to individual class members, that in turn would establish incompatible standards of conduct for the universities and colleges comprising the Academy. *See* Fed. R. Civ. P. 23(b)(1)(A). Additionally, an adjudication in favor or against the putative representative plaintiff would certainly be dispositive of all other members of the class of student debt holders—perhaps not legally, strictly speaking, but certainly politically. *See* Fed. R. Civ. P. 23(b)(1)(B).

15. Relief for the army of people financially indentured to their educational institutions by impossibly high student debt is properly aggregated in the instant action because all of the requirements of Federal Rule of Civil Procedure 23(a) are satisfied, and because the predominant questions at the heart of the issue cut to the Constitutionality, and moreover, garden variety legality of bargains struck between ivory tower institutions that command the power of a rising adolescent's future, and a young person who is not legally permitted to drink alcohol because of concerns about a lack of judgment due to tender age. The predominant question is one of the moral character of our society, and can only be addressed in a forum which considers all student debt holders as a class together. This is especially true in the context of the fiduciary role of the Academy to its most vulnerable students, *i.e.*, those students attempting to elevate themselves from the social working class through higher education. *See* Fed. R. Civ. P. 23(b)(3).

16. Relief for the army of people financially indentured to their educational institutions by means of their student debt is properly aggregated in the instant action because all of the requirements of Federal Rule of Civil Procedure 23(a) are satisfied. Moreover, the assertion of this action through the class vehicle is appropriate because the requirements of Federal Rule of Civil Procedure 23(b)(1), and alternatively, Federal Rule of Civil Procedure 23(b)(3) are met. Additionally, should the Court later determine that the classes must be further refined into, *e.g.*, graduate and undergraduate student loan holders, the Court is empowered by Federal Rule of Civil Procedure 23(c)(5) to differentiate subclasses in rendering a judgment.

17. There is only one avenue for this adjudication, and it is through the mechanism devised by Congress, wherein an army of the disenfranchised is empowered to pool their otherwise flimsy or

meagre resources in collective petition for recourse, as outlined in Federal Rule of Civil Procedure 23.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

18. At the outset, Plaintiff must attest to a series of coincidences that would lead a reasonable person to note them, no matter how outlandish my adversaries may paint her. I hereby attest and certify that during my attempted research into the origins, actors, and material factual circumstances surrounding student debt, I have been subject to inexplicably slow internet service; barred from accessing what otherwise appear to be mainstream web pages, except that the content pertains to student debt; real time modification of web pages, materially changing the tenor of the content; and other stonewalling, during Plaintiff's attempt to question, investigate, and further probe with moral rigor the parameters of the student debt scheme to such an extent that Plaintiff has good cause to believe, at the very least, that the establishment has installed deterrents to the true illumination of its subjects on this matter. In its worst construction, of course, Plaintiff finds it not only a conceivable outcome, but a likely one, that the operative interests adverse to her so virulently oppose their exposure by illumination, that her access to certain resources has been intentionally blocked. To that end, the author apologizes that this pleading was constructed in a single evening and submits it for Court review despite these myriad impediments, not the least of which is that the power disparity is so great, that each earnest reader of the plausible account provided herein is able to perceive the intuitive recognition, in the pit of his or her gut, that the perpetrators of the scheme illuminated herein have effectuated the dispatch of American citizens for suggesting much less. If the suggestion of corruption causes such fear to arise in you such that you are inclined to deride these allegations as "conspiracy theories," before investigating them, you will not benefit from further engagement with this document. If, however, you are willing to believe a child over a man of God, despite the power disparity, the immediate absurdity of such an allegation, and most importantly, because you are able to favor the information of your intuition that there is discoverable truth alleged herein, over the base human instinct to hide from such frightening possibilities, I humbly ask for your patience as I call my own courage to heel, and relay what I believe to be the greatest American scandal since we allowed ourselves to believe that cigarette companies knew they were poisoning our parents, did nothing to stop it, and denied it vociferously until the moment the body politic said: "Enough." So, without further ado, and with the greatest apprehension I have felt, we may, as a class, turn to it.

19. Student debt as facilitative vehicle enabling working class advancement is of relatively new vintage, even in the context of the short two-hundred and fifty-year history of the United States of America. The Promethean student loan program was initiated pursuant to the National Defense Education Act ("NDEA") in 1958, as a response to the Soviet Union's palpable advancement in the field of space exploration, and with the intent of ensuring that the best and brightest receive an education which would facilitate the student to assist his country in the increasingly consequential competition between the rival superpowers on the world stage. *See* "History," *The Federal Role in Education*, U.S. Dep't of Educ., accessed August 29, 2023 at 11:01 p.m., https://www2.ed.gov/about/overview/fed/role.html. By way of context, enactment of the NDEA followed expanding reforms intended to increase access to higher education, initiated after World War II. Specifically, the NDEA appears to have evolved from legislation such as the

Servicemen's Readjustment Act of 1944 (the "G.I. Bill"), which enabled 8 million veterans to attend college in the wake of America's vital engagement in World War II. *See id.*

20. According to the United States Department of Education (hereinafter, the "DOE"), the NDEA "included support for loans to college students, the improvement of science, mathematics, and foreign language instruction in elementary and secondary schools, graduate fellowships, foreign language and area studies, and vocational-technical training." *Id.* American engagement with civil rights writ large was to undergo a massive cultural, social, and political evolution in the 1960's and 70's, which led to the passage of targeted reforms prohibiting discrimination against underserved minorities, and expanding their access to as yet inaccessible societal resources. *Id.* Watershed reform initiatives such as Title IV of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and Section 504 of the Rehabilitation Act of 1973 are barely half a century old. *Id.* It is with even greater facility that the citizenry is perpetually disengaged from the reasonable proposition that we are just now witnessing the long-term impacts of initiatives that—the sincerity of the initial motivations behind the initial offering of student loans aside—have proven themselves to be empirically toxic to the life, liberty, and pursuit of happiness of rising young adults in a free society.

21. In 1965, two landmark statutes were enacted which would pave the way for the creation of what would, in half a century's time, mature into our modern federal student loan program. *See id.* The first was the Elementary and Secondary Education Act, which was responsible for initiating "a comprehensive set of programs, including the Title I program of Federal aid to disadvantaged children to address the problems of poor urban and rural areas," and the Higher Education Act of the same year, which "authorized assistance for postsecondary education, including financial aid programs for needy college students." *Id.*

22. Upon information and belief, the Leviathan that we know today as the student loan program was initially organized under the auspices of Student Loan Marketing Association ("Sallie Mae"), formed in 1973. *See* Best, Joel, Best, Eric. *The Student Loan Mess: How Good Intentions Created a Trillion Dollar Problem.* (May 2, 2014.)

23. Upon information and belief, before 2010, federal loans included "loans originated and funded directly by the Department of Education (DOE)," and "government guaranteed loans originated and funded by private investors." *See* Wikipedia, "History," *Student Loans in the United States*, accessed August 29, 2023 at 11:50 p.m.

24. The amount of student debt has exploded since the Obama-era reforms, including passage of the Higher Education Opportunity Act of 2008, such that a reasonable person would be hard pressed not to conclude correlation, let alone causation between the massive increase in student debt held. Upon information and belief, in 2010, the amount of student debt was estimated to be $830 billion dollars. "By the fourth quarter of 2015," however, the "total outstanding student loans owned and securitized had surpassed $1.3 trillion dollars." *See* "Student Loans Owned and Securitized, Outstanding." www.Research.stlouisfed.org. New York Federal Reserve, April 7, 2016. Web publication, released April 19, 2016. (Site was one of many that could not be accessed because of persistent and unusual laptop interface issues during the research of this Complaint. Access attempted at 11:57 p.m.; access eventually granted during final review at 6:36 a.m.

25. The complex interplay between the sweeping and ill-understood reform statutes initiated by the Obama Administration, such as the Higher Education Opportunity Act of 2008, effective July 1, 2010, which altered the system governing discharge of debt for disability; the 2010 Student Aid and Fiscal Responsibility Act, which eliminated loans guaranteed by the federal government; and the Health Care and Education Reconciliation Act of 2010, which "ended private sector lending under the Federal Family Education Loan Program," initially effective on the same date, and which reorganized "all subsidized and unsubsidized Stafford loans, PLUS loans, and Consolidation loans under the Federal Direct Loan Program, have starkly exacerbated the precipitous position of student borrowers with grievous results. *See* Wikipedia, "History," *Student Loans in the United States*, accessed August 29, 2023 at 12:05 a.m.

26. Upon information and belief, federally obtained student loans are not dischargeable in bankruptcy. Private student loans, however, are dischargeable in bankruptcy, at least in three Circuit jurisdictions, including the Second Circuit. Practically speaking, the current system appears to directly contradict the mission of the DOE to provide greater access to education with reduced risk to vulnerable borrowers. *See* Redden, Elizabeth. "Appeals Court Rules Private Loans Dischargeable in Bankruptcy." *Inside Higher Ed.* (July 16, 2021). https://www.insidehighered.com/quicktakes/2021/07/16/appeals-court-rules-private-loans-dischargeable-bankruptcy. Accessed August 30, 2023 at 12:21 a.m.; *see also* Gladstone, Alexander. "Consensus Builds That Some Private Student Loans Can Be Wiped out in Bankruptcy." The Wall Street Journal. (July 15, 2021.) (Site unable to be accessed because of unusual and consistent laptop freezing during attempts to research student debt; access attempted August 30, 2023 at 12:27 a.m.)

27. In March 2020, student loans payments on principal and interest were subject to a federally imposed hiatus, which has been extended multiple times, and is set to expire on September 1, 2023.

28. Following the Biden Administration's tactical defeat by the majority-conservative Supreme Court of the United States in *Biden v. Nebraska* in June 2023, in which the Court decided to bar President Biden's overture to effectuate sweeping student loan forgiveness by executive action, and deciding in favor of the objecting conservative states and individuals who argued that they would unfairly share liability for debt they did not agree to assume, the Democrats appeared to abandon the immediate battle for student votes, and a further extension of the student loan payment pause was not granted.

29. The lion's share of student debt falls disproportionately on the backs of the most beleaguered generations, Millennials and Generation X, who notably are declining to engage in major life milestones such as having children, buying homes, or properly saving for retirement. *See* DeMatteo, Megan. "Here's the Average Student Loan Debt by Age." CNBC. (December 12, 2020.) Access attempted on August 30, 2023 at 12:37 a.m., but blocked by consistent and unusual laptop freezing (upon information and belief, noting that the highest student debt balances are carried by adults aged 25-49, with the lowest sums held by elder adults aged 62 and older).

30. Middle class parents of aspiring co-eds (who are required to pass credit approval, and are not automatically approved) do not escape unscathed, however, and upon information and belief,

the interest rates of parent PLUS loans were recorded to have reached a rate of 7%, compounding monthly, in 2017. *See* "Interest Rates and Fees." *Federal Student Aid.* (August 3, 2017.) Access attempted on August 30, 2023 at 12:44 a.m., but returned that there were "issues with the server." Graduate students are permitted to take out PLUS loans on their own behalf, and upon information and belief, are subjected to the same usurious practices and unconscionable terms as parent-borrowers. Indeed, credit powerhouse Experian determined in 2019 that borrowers aged 35 to 49 increased their direct loan debt by $45.9 billion, much of which "is reportedly from 800,000 parents who borrowed parent PLUS loans to help send their kids to college." *See* DeMatteo, Megan. "Consumers Age 62 and Older Have the Lightest Student Loan Burden," CNBC. (December 12, 2020.) https://www.cnbc.com/select/average-student-loan-debt-by-age/, accessed on August 30, 2023 at 2:04 a.m.

31. While upon information and belief, discharge of federal student debt is considered taxable income, also upon information and belief, interest payments on private loans remain tax deductible. Furthermore, although federal borrowers are eligible for certain income-based repayment, the interest rates on federal student loans, set by Congress, *see* "Federal Versus Private Loans." *Federal Student Aid.* (May 10, 2017), are higher than those attached to private loans, which again, upon information and belief, are traditionally tied to certain financial indices. *See* Wikipedia, "Interest Rates," *Student Loans in the United States.* Accessed August 30, 2023 at 12:55 a.m., with substantial difficulty.

32. Though sources indicate that the United States DOE "contracts with companies to manage, or service, the loans it owns," I can find little evidence beyond widespread assumption that because the loans are facilitated by the federal government, the debt is owned by the federal government—let alone a record, press release, contract, or other type of albatross indicating that the DOE indeed owns the entire sum of debt in excess of trillions. **No government issued student loan bonds were recorded to exist or debt instruments of any kind exist for investment. No treasury bonds were ever issued to raise capital to lend to students, which is the legal mechanism by which the government lends money.**

33. After the apparent mass exodus of student loan servicers from the fracas, particularly during the COVID-19 pandemic payment pause, new student loan servicers similarly appeared to fill the vacuum. Upon information and belief, as of July 2023, the majority of student loans are currently administrated by four "servicers": Aidvantage, EdFinancial Services, the Higher Education Loan Authority of the State of Missouri, and Defendant Nelnet, Inc. *See* Kantrowitz, Mark. "Why Are Student Loan Servicers Dropping Out?" The College Investor. (July 28, 2021.) Access attempted on August 30, 2023 at 1:05 a.m., but barred by unusual difficulties peculiar to searches regarding student debt.

34. Shockingly, student debt is routinely packaged and sold to investors as "student loan asset-backed securities ('SLABS')" in a mechanism that appears closely akin to the heinous mortgage-backed security packaging scheme which leveled the Lost Generation, *i.e.*, the students who graduated in 2008 or in its immediate aftermath, during the Great Recession. Upon information and belief, federal loans are packaged with private loans, securitized, and sold to investors based on rating. Very little, if any, lip service, has been permitted to discussion of potential insalubrious

similarities between the mortgage-backed securities crisis and the potential contribution of SLABS to the student debt crisis.

35. Regarding the new American Dream of discharge of student debt in bankruptcy, one study found that though approximately 250,000 student borrowers file for bankruptcy each year, "[c]reditors are settling unfavorable cases to avoid adverse precedent and litigating good cases to cultivate favorable precedent," and that "[u]ltimately, this litigation strategy has distorted the law and cultivated the myth of nondischargeability." *See* Iuliano, Jason. "Student Loan Bankruptcy Gap." Duke Law Journal. (October 21, 2020.) Upon information and belief, the study further concluded that the combined effect of the perversion of legal precedent by advantaged and resourced creditors, in addition to their highly effective propaganda campaign to convince student debtors of the debt's nondischargeability, resulted in about half of all bankrupt debtors failing to obtain relief for which they were eligible. *See id.*

36. Upon information and belief, approximately one-third of borrowers will never repay their loans, positioning the burden squarely on the American taxpayer. In light of the *Biden v. Nebraska* decision, I respectfully suggest that it is the responsibility of this Court to examine the legality of the practical application of this mechanism, and to consider instead the proposed resolution suggested herein, along with any other that will combat this scheme of collusion between the federal government and the Academy, while making every conceivable effort to avoid the imposition of additional burden upon the distressed American taxpayer. The resolution suggested herein is centered on settling the burden of the debt on the universities respectively, and permitting the state schools to ameliorate or mitigate their liability by becoming fully state-operated free and public post-secondary schools, akin to the public school system made available to students of lesser means in Kindergarten through the twelfth grade.

### **VIOLATION OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION: CONSPIRACY TO IMPOSE EXCESSSIVE FINES**

37. All of the previously alleged factual allegations, as enumerated by ¶¶ 18-36 herein, are hereby incorporated into this section.

38. Plaintiff recalls, as might Your Honor, and as might a casual reader, that she was raised in an increasingly polarized culture. Plaintiff graduated high school in 2007, in which one central tenet was constantly reaffirmed: a student with a future must attend college. Parents, albeit better equipped to withstand societal pressures than high school students, were subjected to the same propaganda scheme that students were. Lower, middle, and upper-middle class high school students and their parents were subjected to constant and unrelenting pressure from guidance counselors, teachers, school principals, and elected officials, who perpetuated the hegemonic belief that a student who declined to attend higher education was willfully accepting relegation to a lower middle class life, virtually guaranteed to be devoid of achievement or purpose by operation of the student's own election.

39. Upon information and belief, this propaganda scheme pervades the American collective consciousness to this day, such that in 2020 approximately half of American students assumed debt to pay for college. *See* DeMatteo, Megan. "Consumers Age 62 and Older Have the Lightest

Student Loan Burden," CNBC. (December 12, 2020.) https://www.cnbc.com/select/average-student-loan-debt-by-age/, accessed on August 30, 2023 at 1:43 a.m. This continued insistence on assuming massive sums of debt, despite a growing rationalism and disillusionment in the face of strong evidence that student loan debt is an unmitigated societal plague can only be explained by the residual brainwashing of otherwise circumspect and measured individuals.

40. Whether the conspiracy between the United States Government and the Academy was intentionally perpetrated to suppress the working class from its inception, or what appears more likely, that the universities first slowly advantaged their institutions in a manner foreseen by then-Secretary of Education William Bennett in 1987, and the federal government enabled the bureaucratic bloat to further its own political hold over America's future, the impact of handing free money to newly minted and often disenfranchised youth was foreseeable at an early stage. In other words, in levying increases in financial aid as a justification to "blithely raise tuition, confident that Federal loan subsidies would help cushion the increase," the Academy appears to have emulated the Tobacco Industry in neither seeing, hearing, nor perceiving the human misery resulting from its oppressive scheme. *See* Bennett, William J. "Our Greedy Colleges." New York Times. Nytimes.com. (February 18, 1987.) (Attempted access on August 30, 2023, at approximately 1:34 a.m., though Plaintiff admits the article was likely barred by a paywall.)

41. Upon information and belief, in the 20 years between 1987 and 2007, tuition costs rose 326%. *See* Wikipedia, "School Effects." Accessed August 30, 2023 at 1:37 a.m. Upon further information and belief, universities currently raise tuition rates at 3% a year, despite glaring evidence that middle class and lower middle class incomes have not increased to account for the ever-rising cost of living over the past thirty years.

42. Though the federal student loan program advertises repayment plans calculated over a period of ten-years, a 2019 study conducted by New York Life revealed that the average participant polled reported repayment of their student loans consumed the duration of their earning prime, taking a total of 18.5 years to pay off, beginning at age 26 and ending at age 45. *See* DeMatteo, Megan. "Consumers Age 62 and Older Have the Lightest Student Loan Burden," CNBC. (December 12, 2020.) https://www.cnbc.com/select/average-student-loan-debt-by-age/, accessed on August 30, 2023 at 1:43 a.m., *referencing* Katzeff, Paul. "Americans Confess Their Biggest Financial Regrets." Personal Finance. (September 25, 2019.) https://www.investors.com/etfs-and-funds/personal-finance/financial-mistakes-americans-learn-from-biggest-financial-regrets/. Accessed on August 30, 2023 at 1:45 a.m.

43. Upon information and belief, student debt falls disproportionately on people in the lower classes, young women, and those belonging to minority groups. The instant scheme perpetrated by the Academy and the United States government virtually guarantees that young people will be materially prevented from making significant gains in income, such as would enable a citizen to elevation above his or her initial social class. Furthermore, this restriction is effectuated while ensuring that public conception of the aspiring youth continues to rest the responsibility for an eighteen-year old's poor financial choices on the young person, rather than the insatiable avarice of the twin pillars of financial indentured servitude: the federal government, and a university system increasingly permissive of hard-line neoliberalism.

44. Over the course of the past thirty years, in addition to the opportunistic, profligate elevation of tuition rates out of step with any reasonable tether, the university system simultaneously perpetuated the unceremonious expulsion of controversial thinkers and philosophers from traditionally balanced ivory tower academies, including all of the Poison Ivy League. The Academy particularly reviled those philosophers who defended traditionally conservative philosophies, or worse, who argued against broad social reforms without conscience (such as, for instance, the eternal and undeserved *persona non grata* Camille Paglia). In short, upon information and belief, the universities were permitted to raise tuition rates without restraint, in exchange for their imposition of a philosophical directive in hiring, bureaucracy, and formative management of young minds.

45. The most attractive element of the conspiracy, which ultimately seeks to condition entry into the participating body politic as contingent on acceptance of a strictly regimented neoliberal philosophy, was of course that anyone who would need a student loan would necessarily be disenfranchised from objecting to the conspiracy scheme after assuming the scarlet letter of student debt.

46. And so it was that students were inundated with messaging that to achieve anything, they had to attend college, and that this action would be incredibly easy if only they would commit to repayment of an exorbitant sum—indeed, to a recent high school graduate likely incomprehensible—only to learn that the sum was attended by interest payments far in excess of standing usury laws, that interest compounded into principal not annually but monthly, and that the upper middle class career promised was actually at the end of the graduate rainbow, and only in STEM careers, and—most importantly, it was the student's poor planning and lack of judgment at fault for his or her assumption of student loans.

47. Students left menial jobs to enter into agreements that practicing attorneys are hard-pressed to understand, complete with gag-provisions, interest payments compounding monthly at exorbitant and arguably entirely arbitrary rates, and the practical result of in a rising tide of principal with a likely duration of two decades. The same students were disillusioned to find themselves attempting to stem the rising swell of their five or even six figure debt with a liberal arts degree that could not even secure an unpaid internship, and returned to their working wage with the added psychic debt imposed by the segment of the population who had not required funding to attend college: that their social position, ambition to escape it, and belief in the Academy was their individual failure.

48. Upon information and belief, young people have stopped pairing up at rates healthy to maintain a productive population pace, which is likely a factor of the vile practice, upon further information and belief, of disincentivizing marriage by imposing liability for debt on an individual's life partner.

49. The young people who managed to pair up, upon information and belief, similarly stopped reproducing at rates salubrious to maintain a healthy population, likely motivated by the nagging concern that (upon information and belief) employment income rates for working class citizens had remained nearly identical to figures in the 1970's, while the cost of everything else had risen; the reality that one or both of the individuals was likely to be saddled with debt that could not be

discharged even in bankruptcy; and that the cost of a child was an impossible burden, especially considering the prospect of assuming another round of six-figure debt upon the coming of age of the couple's child. The resulting effect, of course, of the Poison Ivy League's rise from stalwart institution to oppressive credit union was much like that of the eponymous, suffocating prehistoric vine, which promises the agonizing torture of significant duration to those unsuspecting folks unlucky enough, or determined enough toward some independent goal, to make contact.

50.  At the heart of all of these social ills—from the extreme polarization that begins by segregating socially desirable students accepting of neoliberalism, from those conservative or libertarian agitators philosophically contrary to it, effectively erecting echo chambers within storied halls of learning; to the declining marriage and birth rates; to the almost unchecked power of social media companies over free speech; to the once-repulsive, now commonly accepted practice of permitting large-scale conglomerates like Amazon veto power over the ability of their employees to assemble peaceably; to the most flagrant modern Constitutional violation: the maintenance by the United States Government of the National Security Agency, as persistent and virtually unreviewable violation of the Third Amendment to the United States Constitution, *i.e.*, as the most striking violation of quartering soldiers in American homes during peacetime; to the increasingly dominant reflex of free citizens to fear their government; all of it and much more—are traceable by thread and breadcrumb to the student debt conspiracy between the federal government and high-brow institutions of secondary education.

51.  The Eighth Amendment to the United States Constitution protects Americans from the most heinous acts and exertions, which are and have been predictably perpetrated by the powerful in various and increasingly creative ways against the less powerful throughout history's watercolors, since before collective remembering. The elemental law provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

52.  The student loan scheme, by which the federal government is granted tacit control of Academy philosophy, and by which university bureaucrats gorge themselves on the American dreams of the poor to the rhythm of interest compounding monthly, is nothing more and nothing less than restrictive lever, skillfully engineered to minimize the number of working class individuals ascending to higher classes, which in the great balance would almost certainly result in a demotion of a member of the established ruling class.

53.  An interest payment will not always warrant the appellation of "fine," which a reasonable person would likely traditionally conceive of as the imposition of a payment as a part of a civil or criminal punishment. For the purposes of this pleading, however, and in the greater context of the power disparity between actors, the interest payments which compound monthly into principal at usurious rates, and most materially, the federal government's various prohibitions on the discharge of federal student debt by even those properly eligible for bankruptcy—warrant the Court's inspection beyond traditional semantics into the veracity of these allegations. This class of vulnerable citizens, more than 46 million strong, is at the mercy of the federal government and its policies of financial excess, and therefore, the name of the penalty payment is less important than its essential nature as the tithe of the rising new religion, or its creative facility as ruthlessly effective tool to deprive, manipulate, and control the working classes, who have committed no crime but aspiring to consummation of their own American Dream.

54. Upon information and belief, discovery in this matter will reveal persuasive circumstantial evidence of Machiavellian political conduct, buttressed by the façade of a once-free media who refuses to meaningfully report on flagrant injustices, and may reveal that the United States government is not the sole owner of the $1.6 trillion debt. Even the slightest possibility that, for instance, a foreign adverse government could hold a portion of this debt, and therefore, be situated to influence American policy outside of citizen-review, requires a ruthless, courageous, and neutral investigation which leads to public clarity of every moving piece of this crisis, in addition to open, dispassionate discussion, and rigorous scrutiny of any public officials who refuse to see it.

**WHEREFORE,**

a) Plaintiff, with humility and respect, seeks the imposition of a temporary restraining order for fourteen (14) days, to enable the Court time to conduct a hearing at which the class of borrowers indentured to the campus bookstore may be heard regarding the imposition of a preliminary injunction pending determination of this litigation; and

b) Plaintiff further requests the imposition of a preliminary injunction for the duration of his action, as all of the factors tend towards the imposition of a stay on the resumption of student loan payments slated to begin September 1, 2023; and

c) Plaintiff further requests the imposition of a permanent injunction, at the conclusion of this action, and following demonstration of the allegations stated herein, enjoining the federal government from further perpetuation of this scheme; and

d) Plaintiff further requests that the liability for the excessive sums borrowed be placed squarely in the lap of the culpable actors, namely, the universities comprising the Academy; in essence, Plaintiff requests that this Honorable Court command that the universities be subjected to the very fate they devised for the most vulnerable and credulous among us: the indefinite indenture of newly minted Americans, in pursuit of the American Dream.

## CONTRACT INVALID FOR UNCONSCIONABILITY & FRAUDULENT INDUCEMENT

55. All of the previously alleged factual allegations, as enumerated by ¶¶ 18-55 herein, are hereby incorporated into this section.

56. The State of Tennessee prohibits the formation of unconscionable contracts, and will render all or part of them invalid or unenforceable upon a sufficient demonstration of unconscionability.

57. Pursuant to Tennessee Civil Code § 47-2-302(1) (2021), "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

58. Furthermore, the law provides that "[w]hen it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." *Id.* at (2). This proviso alone suggests *prima facie* class entitlement to further discovery in this matter.

59. In Tennessee, "[e]nforcement of a contract is generally refused on grounds of unconscionability where the 'inequality of the bargain is so manifest as to shock he judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other." *See Taylor v. Butler*, 142 S.W.3d 277, 285 (Tenn. 2004) (quoting *Haun v. King*, 690 S.W.2d 869, 872 (Tenn. Ct. App. 1984)).

60. Furthermore, "[a]n unconscionable contract is one in which the provisions are so one-sided, in view of all the facts and circumstances, that the contracting party is denied any opportunity for meaningful choice." *See id.* (quoting *id.*)

61. Student loan contracts are plainly contracts of adhesion by nature, defined by the Tennessee Supreme Court as "a standardized contract form that [is] offered essentially on a 'take it or leave it' basis without affording [the plaintiff] a realistic opportunity to bargain." *See Taylor*, 142 S.W.3d at 286. Though not *per se* invalid under Tennessee law, "such a contract may be unenforceable if it is 'beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable.'" *Brent v. CMH Homes, Inc.*, No. E2013-1214-SC-R11-CV, at 8 (Tenn. June 5, 2015) (slip op.) (quoting *Taylor*, 142 S.W.3d at 286).

62. In this particular forum, the Tennessee Supreme Court has a track record of defending the disenfranchised, explaining that "Courts will not enforce adhesion contracts which are oppressive to the weaker party or which serve to limit the obligations and liability of the stronger party." *Id.* (quoting *id.*) (quoting in turn *Buracynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996)).

63. Here, discovery will demonstrate that the bargaining powers between the parties are so disparate, that meaningful negotiation between the parties is beyond impossible; that the propaganda campaign perpetrated by the federal government, tethering the American Dream to college attendance was executed with such subtlety that the unconscionability of the strong actor would be virtually undetectable to most people; and that the federal government's enactment of the 2010 reform laws operated exactly as designed in suppressing the working masses.

64. Plaintiff respectfully requests that this Honorable Court steel itself against the natural fear of every reader at the prospect of true and meaningful opposition to the United States Government, and apply mere common sense to see the oppressive and noxious scene as it exists truly, and not as fear would instruct that it may ideally be—as every prior adjudicator, person of status empowered to truly act or speak against such a scheme, and every other major influence has thus far failed to muster the courage to attempt.

**WHEREFORE,**

a) Plaintiff, with humility and respect, seeks the imposition of a temporary restraining order for fourteen (14) days, to enable the Court time to conduct a hearing at which the class of borrowers indentured to the campus bookstore may be heard regarding the imposition of a preliminary injunction pending determination of this litigation; and

b) Plaintiff further requests the imposition of a preliminary injunction for the duration of his action, as all of the factors tend towards the imposition of a stay on the resumption of student loan payments slated to begin September 1, 2023; and

c) Plaintiff further requests the imposition of a permanent injunction, at the conclusion of this action, and following demonstration of the allegations stated herein, enjoining the federal government from further perpetuation of this scheme; and

d) Plaintiff further requests that the liability for the excessive sums borrowed be placed squarely in the lap of the culpable actors, namely, the universities comprising the Academy; in essence, Plaintiff requests that this Honorable Court command that the universities be subjected to the very fate they devised for the most vulnerable and credulous among us: the indefinite indenture of newly minted Americans, in pursuit of the American Dream.

## **CONTRACT INVALID FOR FAILURE TO DISCLOSE MATERIAL INFORMATION**

65. This case, though complicated by its idiosyncrasies, bears a striking intuitive resemblance to other large scale injustices perpetrated by powerful interest groups in ruthless pursuit of their own pecuniary advantage, at the expense of the disadvantaged, in the latter half of the 20th Century.

66. For instance, the instant student debt scheme bears striking social similarities to the poisoning of the common people by the cigarette industry, or the Catholic Church's scheme of abuse and relocation against its patrons. Both industries were so adept at the proliferation of propaganda that the people stubbornly assisting them in evading justice were none other than fellow citizens, who had not been subjected to such a perverted imposition of power by those preying on the most sensitive elements defining our humanity: the communal element of imbibing, in the case of the moment of peace at the end of a cigarette; in the case of the Catholic Church, the sanctity of a person's relationship with God; or in the case of a rising American, the birthright in the form of pursuit of the American Dream.

67. An adhesion contract between parties demonstrating the ultimate power differential, in which the federal government and the Academy hold hostage a young American's aspiration to something better, have earned an honored position in the halls of Nixon's Olympos, while an eighteen-year-old, poor American, more likely to be female, and much more likely to belong to an underserved minority, occupies a position genuinely considered by the American public to be equal in bargaining power to that of these unfettered powers.

68. Upon information and belief, discovery will reveal the actors, organizations, and motivations driving the operation of this brilliant scheme of collusion, facilitating the open oppression of free thought and action. In order for someone with so little bargaining power to enter

into a such an agreement of her own free will, she must be provided every last underpinning iota of material information. Discovery in this matter, if Your Honor has the stomach to permit it, will show that none of the individuals holding student loan debt were provided a glimpse into the full prism of information that would even the playing field between the parties, such that sustaining such a contract would not violently offend the sensibilities of every remaining person of moral character or conscience in this country, without regard to political affiliation, race, creed, religion, social class or status, and most importantly—regardless of whether the citizen is or is not misfortunate enough to have been manipulated into selling her voice, in exchange for the legs she was led to believe were the only means by which she could dare to hope to rise beyond herself.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter an Order:

a) Temporarily restraining Defendants from effectuating the resumption of student loan payments for the duration of fourteen (14) days pursuant to Federal Rule of Civil Procedure 65, and staying the resumption of all student loan payments slated to begin on September 1, 2023, until Your Honor is able to conduct a hearing to determine whether the four-factor test enumerated in *Winter v. Nat. Resources Defense Council*, 555 U.S. 7 (2008) permits the class to obtain a preliminary injunction for the duration of this litigation; and

b) Issuing a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, staying the resumption of student loan payments until the resolution of the instant litigation, because:

   (1) **Declining to issue a preliminary injunction staying student loan payments will cause irreparable and immediate harm to the most vulnerable among us during the interim in which the Court is adjudicating the merits of this action.** The holders of student debt—the almost three generations of Americans who are being forced to abstain from major milestones, such as buying homes, having children, or retiring—will suffer extensive and irreparable financial harm, in the immediate aftermath of a society recovering from the COVID-19 pandemic; whereas the financial houses and educational institutions have demonstrably remained unharmed, despite not having received student loan payments since 2020, *see City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n. 8 (1983). Should the collusion scheme between the United States Government and the university system be permitted to resume, the risk of harm to borrowers is immediate and definite—not just for current holders of student debt, but for the next class of young hopefuls and their parents who will sell their souls to the campus bookstore; and

   (2) **The balanced equities lend toward only one outcome: that of the issuance of a preliminary injunction.** Stated differently, the disparity in financial position between the ivory tower university system and the individual student is so extreme that they lend strongly in favor of issuing a preliminary injunction

if there is any doubt as to the Constitutionality or legality of the continued imposition of student debt payments under the current system; and

(3) **Evaluation of likelihood on the merits is impossible at this stage.** Because of the numerosity of people impacted; because of the highly unique political set of circumstances, rendering this evaluation to be more than an evaluation of pure law, but indeed fraught with (often deeply polarized) political considerations, the special interests and lobbying of crony capitalists, and the potential for clandestine lenders and the universities alike to engage in subversive and effective—yet still illegal and unjust—actions to avoid liability of this magnitude at any cost, renders the question of likelihood of success on the merits at this stage unintelligible to any truly neutral arbiter; and

(4) **The public interest can only cut in favor of the imposition of a preliminary injunction for the duration of this action.** If there has ever been a case where the public interest element has been met, it is one in which the most vulnerable among us are spared from either assuming new debt, or from making potentially unjust and illegal payments during the Court's consideration of the propriety of the scheme to which they dare to venture an objection.

c) Permitting extensive discovery into the identities of any banks, credit unions, institutions, financial houses, individuals, or any other entity or lender who now owns or ever has owned student debt, and all records related or pertaining thereto; essentially, that the Court enter an order illuminating the seedy underbelly of the world of student loan debt; and

d) Ultimately invalidating the debt assumed by or on behalf of all students under the age of twenty-one in its entirety, as against the named individuals or their parents, guardians, or guarantors; and repositioning liability for the sum against the university, college, or other institution to which it is owed; and

e) Ultimately repositioning any outstanding interest payments onto the lenders currently holding the debt; and

f) Ultimately invalidating the debt assumed by or on behalf of all students over the age of twenty-one by at least half, as against the named individuals or their parents, guardians, or guarantors, with a graduating elimination scale based on actual salary earned over a three-year period; and

g) Ultimately repositioning any outstanding interest payments onto the lenders currently holding the graduate debt; and

h) Preventing this iniquitous scheme from perpetuating by issuing a permanent injunction preventing the United States Government or any other entity from benefiting from interest on student loans; and

i) Preventing this iniquitous scheme from further perpetuating by preventing the application of a clause compounding student loan interest monthly in a contract of adhesion between grossly disparate parties; and

j) Preventing this iniquitous scheme from further perpetuating, by preventing the universities, colleges, or other educational institutions from becoming rich at the expense of students by prohibiting these institutions from raising tuition rates out of step with a demonstrated increase in aggregate working class salaries; and

k) Any other remedy this Honorable Court deems appropriate.

Your Honor, 43.6 million Americans depend on the activity of your individual conscience in reviewing this pleading. With the greatest humility, and no small amount of fear, I ask that Your Honor show the working class that corruption has not bled into all of America's ivory towers. No matter your personal leanings or political apprehension in undertaking such a controversy, I implore you in the strongest possible terms to show this country that once in a blue moon, every American will at least be heard—regardless of how large the entrenched powers of the Goliath positioned across the v. loom, and no matter how small and insignificant the putative wielder of the slingshot.

Respectfully submitted,

Rachel Spears Johnston, Esq.
rachel.spears.johnston@gmail.com
**Attorney ID**: 274372018

**DATED**: September 10, 2023

## VERIFICATION

1. The allegations contained in the Verified Complaint are true to the best of my knowledge and belief.

2. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Rachel Spears Johnston, Esq.<br>
rachel.spears.johnston@gmail.com<br>
<b><u>Attorney ID</u></b>: 274372018

**DATED**: September 10, 2023

Rachel Spears Johnston
P.O. Box 55
372 Green Village Rd.
Green Village, NJ 07935

17
9-12

RECEIVED
SEP 12 2023
U.S. District Court
Middle District of TN

```
RACHEL JOHNSON            0.6 LBS LTR 1 OF 1
(201) 738-2040            SHP WT: 1 LBS
462 W 42ND ST             DATE: 11.SEP.2023
NEW YORK NY 10036

SHIP CLERKS OFFICE
TO:  MIDDLE DISTRICT OF TENNESSEE
     FRED D THOMPSON UNITED STATES
     COURTHOUSE & FEDERAL BUILDING
     719 CHURCH ST
     NASHVILLE  TN 37203

           TN 371 9-02

UPS NEXT DAY AIR SAVER    1P
TRACKING #: 1Z X24 411 13 8782 7302

BILLING: P/P

REF #1: EP
```

Clerks Office, Middle District of Tennessee
Fred D. Thompson United States
Courthouse & Federal Building
719 Church Street
Nashville, TN 37203