IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

RACHEL SPEARS JOHNSTON,           )
                                  )
          Plaintiff,              )
                                  )          NO. 3:23-cv-930
v.                                )          JUDGE RICHARDSON
                                  )
THE UNITED STATES OF AMERICA, et  )
al.,                              )
                                  )
          Defendants.             )

## MEMORANDUM OPINION AND ORDER

On October 2, 2023, Plaintiff filed a motion for a temporary restraining against Defendants. (Doc. No. 11, "Motion"). This Motion purported to correct the flaws that led the Court to deny her previous motion for a preliminary injunction (Doc. No. 8, "PI Motion"), insofar as that motion was also requesting a TRO, in an order dated September 25, 2023 (Doc. No. 9, "Order").

TROs and preliminary injunctions are considered preventive, prohibitory, or protective measures taken pending resolution on the merits, *see Clemons v. Board of Educ. of Hillsboro, Ohio*, 228 F.2d 853, 856 (6th Cir. 1956), and are considered extraordinary relief. *See Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972). The Court turns to Plaintiff's particular request for relief as set forth in the Motion.

### 1. Plaintiff's Request Lacks the Specificity Needed for a TRO

As an initial matter, Plaintiff requests a TRO for a fourteen-day period until the PI Motion can be decided on the merits. (Doc. No. 11 at 2). However, Plaintiff's request lacks precision in identifying what exactly she wishes to enjoin. Plaintiff requests the TRO to prevent "an estimated

43 million people" from being "subject to potentially unconstitutional payments to the federal government on October 1, 2023." (*Id.* at 3). While Plaintiff's Motion is clear that she wants the Court to prevent Defendants from collecting payments on federal student loans,[1] Plaintiff's TRO request is not specific enough for the Court to issue a TRO that adequately addresses what all would happen to the loans, the borrowers, the lenders, and the loan servicers while the TRO is in effect (or thereafter, especially if the TRO is later found to have been issued in error). Indeed, Plaintiff's proposed order even suggests (to very puzzling effect) that the *unnamed plaintiffs* should be enjoined. (Doc. No. 11-4 at 2 ("irreparable harm will occur if the putative class *is permitted* to make further student loan payments to the federal government") (emphasis added)). Plaintiff's Motion itself does not: specify which Defendants collect the payments, as is necessary for the Court to know who would be enjoined; specify whether interest should accrue on the loans during the period of the TRO; or explain what if anything should happen to federal student loans that are being issued but do not yet require payments. Plaintiff requests that the TRO maintain the pandemic-relief student-loan pause ("the payment pause"), but she does not explain the terms of that pause, including, among other details, how that pause relates to each of the Defendants named in this case.[2] Altogether, the lack of specificity leaves the Court fallow of information necessary to issue the limited emergency relief provided by a TRO.

## 2. Plaintiff is Not Excused from Providing Notice

The Motion requests that actual notice to Defendants be excused because Plaintiff is seeking relief "in advance of the specific October 1, 2023 date" and because the Defendants should

---

[1] Defined by Plaintiff in her Complaint to include loans funded by the federal government as well as loans guaranteed by the federal government (but funded by private entities). (Doc. No. 6 at 6).

[2] Plaintiff describes her requested continuation of the payment pause as something that would maintain the status quo, which raises further problems. *See infra* note 3 and accompanying text.

have been put on notice by her complaints, which she acknowledges were noncompliant with the rules. (Doc. No. 11 at 4). The Court finds this argument unpersuasive.

To begin, Plaintiffs' assertions of constructive notice are unpersuasive. To say, as Plaintiff does, that a complaint "seek[s] emergent relief," (Doc. No. 11 at 3-4), is not to say that the plaintiff is presently requesting a TRO. And while Plaintiff certified that she mailed the second amended complaint (Doc. No. 6, "Complaint"), she has not provided proof that it was received. Her attachment at Doc. No. 11-1 certifies that she mailed the Complaint on September 13, 2023, but the mail receipt attached at Doc. No. 11-3 is dated September 5 and 7. And Defendant's mere receipt of the Complaint, even if it had occurred, would be insufficient since Defendants very well could have relied on the local rules and known that if a TRO were being sought, it needed to be sought via a separate motion. Even if constructive notice would suffice in this case to waive the notice requirement, Plaintiff has not provided evidence for the Court to find that such notice was achieved. Insofar as Plaintiff here is asking to be excused from the burden of notice, Plaintiff does not suggest that she was unable to provide notice. Plaintiff could have mailed copies of the Motion to Defendants contemporaneously with mailing them to the Court, and she has offered no statements or evidence that doing so was too burdensome. To the contrary, she has offered evidence to show she was able to provide notice of other filings by certified mail.

Further, Plaintiff does not make any argument as to why she is situated in such a way that she would be endangered by any delay occasioned by providing notice—save for the fact that the student-loan repayment would begin. While the Complaint alleges that student-loan repayment would engender a vast array of social consequences, the majority of them are long-term effects of student debt and not immediate consequences that would befall the individual in the up-to fourteen-day period of a TRO.

### 3. Plaintiff's Timing Ultimately Warrants Denial of Her Motion

Plaintiff asks for relief starting October 1. (Notably, this date has itself changed from the date on Plaintiff's Complaint, September 1, as explained further below). The October 1 date may make the motion moot depending on how Plaintiff's Motion is read. Insofar as the Motion was intended to preserve the status quo, (*See* Doc. No. 11 at 3 ("it is in the interest of justice to preserve the status quo at the time of filing for the duration of the suit")), it is moot because as of October 1— the day before Plaintiff filed—the status quo had already changed.[3] On the other hand, Plaintiff seems to ask for injunctive relief to prevent the ongoing collection of loan payments before the preliminary injunction can be decided. (*See* Doc. No. 11 at 3). Even interpreting the Motion in this manner, the TRO nevertheless fails because the Court upon its own authority and discretion finds that the doctrine of laches can and should apply here. *See Carson v. Burke*, 178 F.3d 434 (6th Cir. 1999) (affirming the district court's decision based on a sua sponte application of laches).

---

[3] This assumes that the existence of the federal government's temporary relief plan could itself be considered a state of "status quo." That a TRO would maintain the status quo is not itself a requirement for the existence of a TRO. However, the Court acknowledges that the general purpose of a TRO is to maintain the status quo, but that then begs the question of what constitutes the status quo in a particular case. "[W]hat constitutes the 'status quo' often is in the eye of the beholder; what a movant can reasonably characterize as a (proposed) TRO that would merely 'keep things the same' can often reasonably be characterized by the opposing side as one that would change things diametrically." *Bankers Life & Cas. Co. v. McDaniel*, No. 3:21-CV-00247, 2021 WL 1165974, at *5 (M.D. Tenn. Mar. 26, 2021). In her Motion, Plaintiff's cursory mention of maintaining the status quo at the time of filing is unpersuasive because, but for Plaintiff's own failure to follow to this Court's local rules (or to file earlier, for that matter), the TRO could not be processed before the status quo changed. The Court need not decide whether Plaintiff, as a licensed attorney, should be held to a standard of compliance with these rules that is higher than the typical pro se litigant, because Plaintiff has made arguments based in her knowledge of the court system and the time it takes to adjudicate a TRO and preliminary injunction (*See e.g.*, Doc. 11 at 2 n.2, 3). Accordingly, based on Plaintiff's representations, it seems an unfair burden to defendants to halt a nationwide process they have set into effect, when there appears no reason Plaintiff could not have raised this challenge earlier and purports to understand the time constraints of litigation.

The applicability of laches[4] in a particular context often is, to say the least, an unpredictable matter. What the undersigned wrote decades ago about this general reality remains true today:

> [T]he law has long embraced a subjective, unpredictable and ad hoc approach to determining whether a claimant's remedy is barred by the lapse of time: laches. "Laches is an equitable doctrine which may be applied to deny relief to a party whose 'unconscionable delay in enforcing his rights has prejudiced the party against whom the claim is asserted.' " Laches generally applies only to equitable claims, although in some cases it will be applied to actions at law. Inevitably, laches has been compared to statutes of limitations, even to the point of being deemed a "quasi statute of limitations." Nevertheless, the two differ markedly in their mode of operation. Unlike statutes of limitations, laches is a flexible concept which eschews mechanical rules and instead is based on fairness.

> In deciding whether to apply laches, most courts consider several factors, such as the nature and cause of the plaintiff's delay in asserting a claim despite the opportunity to assert it, the nature of the relief requested, the extent of the defendant's knowledge that the claim would be asserted, and the prejudice to the defendant if the claim is allowed. Other factors include the length of the delay, the loss of evidence, the opportunity of the plaintiff to have acted sooner, and whether the defendant or the plaintiff possessed the property in dispute, if any, during the delay. In a larger sense, " 'laches is principally a question of the inequity of permitting a [particular] claim to be enforced.' "

> Moreover, application of laches clearly is discretionary with the trial court. To be sure, a trial court's discretion to apply laches is not limitless. Even courts that use a balancing approach recognize the requirements that the plaintiff " 'unreasonably delayed in [filing suit] and that the delay harmed the defendant.' " Some courts even frame their test for laches in terms of required elements rather than flexible factors. Those elements, however, are the same requirements referenced above. Those requirements are patently subjective and flexible.

---

[4] To promote clarity of analysis, the Court must here explain its terminology, which may differ substantially from the terminology used by cited cases or the parties herein. As the term is used herein by the undersigned, laches is "applicable" when a court rules that laches bars the particular equitable relief at issue, whereas laches is only "potentially applicable" when the court is not prohibited *ab initio* from applying laches by threshold considerations—such as laches being entirely supplanted by a *potentially* applicable statute of limitation or the fact that the kind of requested relief at issue is not the kind of relief subject to the equitable concept of laches—but may yet determine not to apply laches. *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227 (6th Cir. 2007), cited below, actually used the phrase "is even applicable," *id.* at 231, without including "potentially"; in context, however, the phrase clearly was meant to mean *potentially* applicable as that term is used herein. Notably, even where laches is "potentially applicable" as the Court uses that term, a district court cannot apply—lacks the discretion to apply—laches unless the court finds that its two required elements exist. Where the terminology of Plaintiff or Defendants, or of a cited case, for these concepts differs from the Court's terminology, the Court will convert such terminology into the Court's terminology.

> Clearly, laches provides courts with considerable flexibility to decide whether to bar equitable remedies due to a delay in commencing suit. The law permits courts to use laches notwithstanding its ad hoc, subjective and unpredictable nature.

Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L. J. 1015, 1065–67 (1997) (footnotes omitted). A district court thus enjoys considerable discretion to apply or decline to apply laches to a particular equitable remedy[5] under particular case-specific circumstances; flexibility exists, albeit to a lesser extent, even in jurisdictions recognizing required elements of laches. Thus, there is no magic formula to foretell whether the court should or will apply laches.

Turning to specific applicable legal standards binding upon it, the Court first notes that "[i]n this circuit, laches is 'a negligent and unintentional failure to protect one's rights.'" *United States v. City of Loveland, Ohio*, 621 F.3d 465, 473 (6th Cir. 2010) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)); *see also Lucking v. Schram*, 117 F.2d 160, 162 (6th Cir. 1941) (explaining that the doctrine of laches is rooted in the principle that "equity aids the vigilant, not those who slumber on their rights."). Although this description of laches sounds relatively broad and conceptual, the Sixth Circuit is one of those courts that does prescribe particular required elements of laches. Assuming that laches is potentially applicable, it requires two showings: "(1) lack of diligence by the party against whom [laches] is asserted, and (2) prejudice to the [opposing party]." *City of Loveland*, 621 F.3d at 473. The first element sometimes is described in terms not of lack of diligence, but rather of unreasonable delay. *See,*

---

[5] Laches generally is potentially applicable to requested equitable relief (including but not limited to injunctions) sought in civil actions. *See Obiukwu v. United States*, 14 F. App'x 368, 369 (6th Cir. 2001); *Memphis A. Phillip Randolph Inst. v. Hargett*, 473 F. Supp. 3d 789, 795 n.8 (M.D. Tenn. 2020). By contrast, laches generally is not potentially applicable to claims for money damages, although there are exceptions. As explained by another district court in this circuit, "[l]aches is an equitable doctrine and, as a general rule, remains inapplicable to legal claims for damages." *United States v. Robbins*, 819 F. Supp. 672, 674 (E.D. Mich. 1993) (citations omitted). On the other hand, "[c]laims in equity, of course, invite equitable defenses, including laches." *Id.* at n.2.

*e.g.*, *Brown-Graves Co. v. Cent. States, Se. & Sw. Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000) ("Laches consists of two elements: (1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party."). Assuming these elements are met, "[a] constitutional claim can become time-barred [by laches] just as any other claim can." *Mich. Chamber of Com. v. Land*, 725 F. Supp. 2d 665, 681 (W.D. Mich. 2010) (quoting *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 9 (2008)).

The decision whether to apply laches is within the sound discretion of the district court, inasmuch as the Sixth Circuit reviews "a district court's resolution of a laches question for an abuse of discretion." *Chirco*, 474 F.3d at 231 (quoting *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 589 (6th Cir. 2001)); *see also Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 534 (1956) ("[T]he [application] of laches is a question primarily addressed to the discretion of the trial court" (quoting *Gardner v. Panama R. Co.*, 342 U.S. 29, 30, (1951))). Notably, from a review of Sixth Circuit case law as a whole, it appears implicit that the district court is vested with discretion both as to the determination of whether the two elements of laches exist and to the subsequent decision (if it is even reached) whether to apply laches.

The Court finds that Plaintiff lacked diligence in asserting her rights. Plaintiff does not allege that she was unaware until just recently that payments were becoming due. To the contrary, Plaintiff's Complaint suggests that she may be suing only because other debt relief plans have ended or failed. (Doc. No. 6 at 7 (noting the end of the payment pause during the pandemic and the Supreme Court's decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023)).[6] However, Plaintiff identifies the payment pause as just that—a "pause." (*See, e.g.*, Doc. 11 at 3). Therefore, it does

---

[6] Plaintiff has not provided the year in which she took out her loans or her years in law school by which such a date could be inferred.

not strike the Court as diligent for Plaintiff to wait until the payment pause ended to file suit when she could have filed suit anytime during the payment pause.[7] Nor does it indicate the state of emergency or necessity for which a TRO is generally reserved. "A manufactured emergency does not warrant emergency relief." *Crookston v. Johnson*, 841 F.3d 396, 399 (6th Cir. 2016).

Indeed, the Sixth Circuit has held that the age of the challenged behavior weighs against the challenging party, even when the challenge is a constitutional challenge. *Cf. Memphis A. Phillip Randolph Inst. v. Hargett*, 473 F. Supp. 3d 789, 796 (M.D. Tenn. 2020) ("In fact, the Sixth Circuit has made clear that the age of laws subjected to constitutional challenge is indeed relevant to the laches inquiry, in particular to the first element."); *Crookston*, 841 F.3d at 398–99 ("The challenged rules are not new") (discussing a 2016 challenge to a 1996 election law sixty days before the relevant election). Plaintiff's allegations in her Complaint date the "the Leviathan that we know today as the student loan program" to 1973 (and even that allegedly was preceded with several decades of earlier relevant actions). (Doc. No. 6 at 5-7). Even applying the later dates in Plaintiff's allegations that link the origins of the government action to 2008–2015, *id.* at 6-7, that still left Plaintiff with years to file the Complaint before October 1, 2023, albeit limited to the unknown date when she herself took out loans. (To be clear, Plaintiff's allegations are not linked to the payment pause ending except that the alleged financial harm restarts—but the underlying contract and government behavior that Plaintiff challenges allegedly has been ongoing for years, even decades). Even the payment pause began in March 2020. *Id.* at 7.

---

[7] Plaintiff does not provide allegations for when she took out her loans, but it is very well possible she had loan payments prior to the payment pause. That is to say, the Court does not have enough information to know whether repayment is even a new status for Plaintiff.

While Plaintiff asks that the Court recognize that she initiated this suit on August 31, 2023, with the filing of her first complaint (Doc. No. 11 at 3),[8] that complaint sought "emergent relief" for the end of the student-loan repayment pause beginning September 1, 2023. (Doc. No. 1 at 1). That date has remained in each subsequent iteration of the complaint, including the operative Complaint. Plaintiff's Motion states that her Complaint "show[s] that an estimated 43 million people will be subject to potentially unconstitutional payments to the federal government on October 1, 2012, two days from the date this motion is submitted to the Court." (Doc. No. 11 at 3). However, the Complaint never mentions October 1.[9] Accordingly, the alleged "emergency" requiring relief in this case by October 1 or prior to the resolution of the motion for a preliminary injunction was, an emergency brought on by Plaintiff's failure to file with prudent timeliness.[10]

Having found that Plaintiff was not diligent, the Court addresses the extent of the prejudice to Defendants and finds that the prejudice would be substantial. According to Plaintiff's allegations, the collection of loan payments from forty-three million borrowers were scheduled to restart on September 1. (Doc. No. 11 at 3). Plaintiff's allegations include no information about what payments are required from borrowers in that fourteen-day window if any, but in fairness to Defendants, the Court will assume that all borrowers had payments come due October 1. And, because the Court did not receive the Motion until after October 2, the October 1 date had passed and the scheduled resumption of payments went into effect. As a result, Defendants would not

---

[8] There is some argument in her preliminary injunction motion about the date the original complaint was filed, (Doc. No. 8 at 2 n.1), but the Court notes that Plaintiff even switches the date she believes it was filed between her motions (*Compare id., with* Doc. No. 11 at 3). Regardless, the precise date between August 30 to September 1 that the first complaint was filed makes no difference to the Court's analysis.

[9] This confusion between the September and October dates provides further support for the Court's conclusion that Plaintiff's arguments of constructive notice are insufficient and ineffective.

[10] To the extent that Plaintiff's Complaint alleges personal attacks against her by Defendants (Doc. No. 6 at 5), she has not suggested that any of those allegations are the basis for her TRO.

only be prevented from continuing their repayment program as planned, but they would also have

to halt a multi-million-person program just days after it had started. This likely would put

Defendants and their program in a state of disorder, forcing them suddenly to change their

communication to borrowers and loan servicers, as well as develop new processes for tracking

payments made (or not made) after October 1.[11] *Cf. Memphis A. Phillip Randolph Inst.*, 473 F.

Supp. 3d at 800-01 ("the Court finds prejudice from the fact if injunctive relief were granted at

this late date, the State would have to take such action much more quickly than if Plaintiffs had

sought such injunctive relief as soon as they should have; quicker action tends to mean more

expensive and error-prone action. The Sixth Circuit has suggested that such circumstances

constitute prejudice resulting from a plaintiffs' [sic] delay" (citing *Crookston*, 841 F.3d at 399));

*Archer v. Griswold*, 638 F. Supp. 3d 1246, 1259 (D. Colo. 2022).[12]

Plaintiff argues (via her attached proposed order and certification) that the government

would not be prejudiced "because of the mechanisms in place for the federal government to recoup

its debts, including wage garnishment and prevention from discharge of student debt in

bankruptcy, such that any sum determined to be owed is certain to be recovered." (Doc. No. 11-4

at 2. *See* Doc. No. 11-1 at 2). That argument misunderstands the evaluation of prejudice. Prejudice

---

[11] While the legal issues involved in this case are far different from those the Supreme Court faced in *Biden v. Nebraska*, 143 S. Ct. 2355, 502 (2023), it is notable that the Court characterized the "economic and political significance" of the student-debt forgiveness programs in that case as "staggering." While the Court there was looking at the long-term consequences of specific forgiveness plans by the Secretary of Education that do not have bare directly on the short-term consequences of a TRO, this Court nevertheless recognizes that the Supreme Court was cautious in interfering with the collection of student loan payments given the potential effects on the U.S. economy. That caution suggests that the size of the U.S. student debt is a relevant factor in our present analysis. Indeed, it is hard to imagine that untimely interference with a program that has a "staggering" "economic and political significance," even for a short period, could not be prejudicial to Defendants—especially without notice.

[12] The Court finds support in the "Purcell Principle" underlying election cases. That principle "also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process." *Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 31, 208 L. Ed. 2d 247 (2020). That same encouragement is relevant here.

is not about the ability ultimately to collect the underlying money; here it is the burden—and expense—of stopping a government program dead in its tracks because of Plaintiff's delay in bringing suit. Plaintiff ignores the costs Defendants would incur now, extending beyond the payments they will not collect and including such other expenses as the burden of tracking which borrowers paid before and after the TRO and the substantial undertaking of coordinating all the moving pieces among the multiple large institutions that are Defendants to this action. The Court further notes that Plaintiff has not even alleged when her payments are owed, in what amounts, and at what interest rate; indeed, Plaintiff provides little factual information about her own loans, not even mentioning her own student loans in this Motion and mentioning them only briefly and imprecisely in the Complaint, (Doc. No. 6 at 2, 4) and PI Motion (Doc. No. 8 at 5).[13] Therefore, the Court can neither measure the prejudice to Defendants in not receiving these payments nor, for that matter, adequately understand the burden on Plaintiff that the TRO would address.

Additionally, enacting a TRO after October 1 would introduce a new division within the potential class plaintiffs, by creating a group for which payments had been made between October 1 and the granting of the TRO. While such a result may occur if a preliminary injunction is put into place, Plaintiff's allegations do not support introducing that complication to this litigation and judicial efficiency cautions against it.

---

[13] That Plaintiff has failed to provide specifics about her own representative claims may raise issues of standing and class certification. *See, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6, (2016) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.' " (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 40 n.20 (1976))); *Rivers of Life Int'l Ministries v. GuideOne Ins. Co.*, No. 1:22-CV-01114-STA, 2022 WL 17261845, at *2 (W.D. Tenn. Nov. 18, 2022) ("[N]amed plaintiffs 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996))).

Finally, while the Court need not reach the merits of Plaintiff's Motion, the Court notes that it is likely that the Motion would fail on the merits. The lack of specificity, as noted above, would likely prove fatal at a merits determination, as would other flaws in her argument. For example, Plaintiff has not persuasively shown that there would be an irreparable harm absent the requested relief. As mentioned above, Plaintiff has made no argument that she herself would suffer an irreparable harm. She has not alleged that she has a specific payment due on October 1—and it appears from the certification attached to her Motion that some borrowers may not have payments come due until an alternative date of October 14—or any other form of harm that would specifically befall her as the representative party. Plaintiff's Motion argues that borrowers would be without the use of the money used to make their payments during the suit and, subsequently denied the time value of that money even if the suit succeeds. (Doc. No. 11 at 3). While this is *a* harm, Plaintiff has made no allegations that it is an *irreparable* one. If Plaintiff's claims did prove meritorious, monetary damages could be awarded, and prejudgment interest is designed to compensate plaintiffs in this type of situation for the time value of their money lost during the course of litigation.

### 4. Plaintiff Shows No Signs of Being Prepared to Meet Rule 65(c)'s General requirement to Post Adequate Security

Rule 65(c) provides, in pertinent part, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Plaintiff does not address the issue of a bond. This is problematic. Plaintiff proposes a TRO that would have an enormous effect, and the Court can easily imagine very large "costs and damages" being sustained by persons Plaintiff seeks to have enjoined. Plaintiff shows no signs of coming to terms with this fact or the potential for any TRO

later to be determined to have been wrongfully issued. Thus, based on the instant record, Plaintiff's apparent inability to provide adequate security to cover those potential costs and damages is another, independent ground for denying her request for a TRO.

5. **Plaintiff's PI Motion is Encompassed within the Scope of the Referral to the Magistrate Judge for a Report and Recommendation on Non-dispositive Motions.**

Plaintiff also requests clarity as to the previous order wherein the undersigned referred this matter to the magistrate judge pursuant to referring the motion for a preliminary injunction to the magistrate judge under 28 U.S.C. § 636(b)(1)(A) & (B) and stated (with admittedly, less than ideal clarity) that "Plaintiff's remaining Motion for a Preliminary Injunction is reserved for the Magistrate Judge." (Doc. No. 9 at 2). Plaintiff correctly observes that under 28 U.S.C. § 636(b)(1)(A) a magistrate judge cannot determine a motion for injunctive relief, and, therefore, Plaintiff assumes the referral "was for the purpose of setting an expedited briefing schedule between the parties only." (Doc. No. 11 at 2 n.2). This assumption is incorrect, but the Court does not dispute that clarification is appropriately sought as to what the Court meant by saying that the motion for a preliminary injunction is "reserved for the Magistrate Judge." Pursuant to a referral under 28 U.S.C. § 636(b)(1)(B), a magistrate judge may submit "proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A)." As Plaintiff herself notes, (Doc. No. 11 at 2 n.2), a motion for preliminary injunction is excepted from subparagraph (A). Thus, to clarify for Plaintiff, what the Court meant is that pursuant to 28 U.S.C. § 636(b)(1)(B), her motion for a preliminary injunction has referred to the magistrate judge for a report and recommendation (as opposed to a *determination*), and not just for mere "briefing schedul[ing]" or "scheduling assistance" (Doc. No. 11 at 4, 11 at 2 n.2).

## CONCLUSION

For the reason set forth above, the Motion (Doc. No. 11) is DENIED.

IT IS SO ORDERED.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE